**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

**M.W., by next friend JEANELLE SWINEY;**

**and**

**D.P., by next friend PRINCHIA POWELL;**

***Plaintiffs*,**

***v.***

**OFFICER JOHN DOE ONE**
**(in his individual and official capacity);**

**OFFICER JOHN DOE TWO**
**(in his individual and official capacity);**

**OFFICER JOHN DOE THREE**
**(in his individual and official capacity);**

**OFFICER JOHN DOE FOUR**
**(in his individual and official capacity);**

**and**

**OFFICER JOHN DOE FIVE**
**(in his individual and official capacity);**

***Defendants.***

**CIVIL NO.**

**COMPLAINT AND JURY DEMAND**

**COMPLAINT**

M.W. and D.P. ("Plaintiffs"), by and through their undersigned counsel, bring this Complaint for damages because they were the victims of an unlawful stop and seizure and false imprisonment by Officer John Doe 1, Officer John Doe 2, Officer John Doe 3, Officer John Doe 4, and Officer John Doe 5 (collectively, the "Defendant Officers") of the Arlington County Police Department ("APD") in their respective individual and official capacities.

## NATURE OF ACTION

1. This action arises under the Constitution of the United States of America ("Constitution"), 42 U.S.C. § 1983 ("§ 1983") and Virginia common law.

2. This case involves two Black teenage girls, M.W. and D.P., whom Defendant Officers unlawfully detained on February 17, 2025. The girls were fifteen years old at the time of their detention. After the girls left Pentagon City Mall and were walking through the Pentagon City Metro Station to catch a train home, Defendant Officers, accompanied by Metro security, claimed the girls had shoplifted from a Lululemon store they had never visited. Despite lacking reasonable suspicion or probable cause, the officers: (i) informed the girls that they were not free to leave, (ii) handcuffed D.P., (iii) interfered with the girls' attempts to contact their parents, and (iv) physically forced the girls off the train platform to a secondary location within the station where they were held for an additional thirteen minutes.

3. The detention constituted an unlawful arrest in violation of the Fourth and Fourteenth Amendments and false imprisonment under Virginia common law. The girls seek relief for the fear, suffering, and trauma they suffered at the hands of the officers.

4. As alleged in greater detail below, Officer John Doe 1, Officer John Doe 2, Officer John Doe 3, Officer John Doe 4, and Officer John Doe 5 deprived M.W. and D.P. of their rights guaranteed under the Fourth Amendment to the United States Constitution and Virginia common law by unlawfully and recklessly seizing and falsely imprisoning D.P. and M.W.

## JURISDICTION AND VENUE

5. This Court has jurisdiction to hear this Complaint pursuant to 28 U.S.C. § 1331 over the claim arising out of violations of the United States Constitution. Supplemental jurisdiction over the pendent state law claim exists pursuant to 28 U.S.C. § 1367(a).

6. This Court has personal jurisdiction over the Defendant Officers pursuant to Virginia Code § 8.01-328.1(A)(3) because each Defendant Officer caused tortious injury by an act or omission in the Commonwealth of Virginia.

7. Venue is proper in the United States District Court for the Eastern District of Virginia under 28 U.S.C. § 1391(b)(2) because all of the acts or omissions giving rise to the claims herein occurred in this District.

## PARTIES

8. M.W. and D.P. were at all times relevant to this Complaint minors and private individuals entitled to the protections guaranteed under the Fourth Amendment to the United States Constitution, the Virginia Constitution, and the laws of the Commonwealth of Virginia.

9. Defendant Officer John Doe 1 was at all times relevant to this Complaint an officer of the APD. He is sued in his individual and official capacity.

10. Defendant Officer John Doe 2 was at all times relevant to this Complaint employed by APD. He is sued in his individual and official capacity.

11. Defendant Officer John Doe 3 was at all times relevant to this Complaint employed by APD. He is sued in his individual and official capacity.

12. Defendant Officer John Doe 4 was at all times relevant to this Complaint employed by APD. He is sued in his individual and official capacity.

13. Defendant Officer John Doe 5 was at all times relevant to this Complaint employed by APD. He is sued in his individual and official capacity.

14. At all times relevant to this Complaint, the parties were present in the Commonwealth of Virginia, and Defendant Officers acted individually and under color of Virginia law.

15. Furthermore, at all times relevant to this Complaint, Defendant Officers knew or should have known that M.W. and D.P. enjoyed federal constitutional and state common law rights to be free from unlawful and unreasonable stops, seizures, and false imprisonment.

**FACTS**

16. On February 17, 2025, M.W. and D.P. visited the Pentagon City Mall, located at 1100 South Hayes Street, Arlington, Virginia, 22202, in order to attend a pre-scheduled appointment at the Apple Store to repair a pair of headphones.

17. While at the mall, the girls browsed at various stores, made TikTok videos, and purchased food and beverages from various vendors including Kong Dog Corn Dogs and Cinnabon. The girls did not enter the Lululemon store located in the mall.

18. The girls exited the mall around 4:00 PM and walked back to the Pentagon City Metro Station to await their train.

19. Unbeknownst to M.W. or D.P., earlier that day, APD officers received a report from a Lululemon employee that two individuals had shoplifted merchandise from the Lululemon store inside Pentagon City Mall.

20. Upon information and belief, the Lululemon employee described both shoplifters as short females and noted that one was wearing a pink jacket.

21. While M.W. was wearing a pink jacket when the Defendant Officers and Metro security approached her and D.P., M.W. is not short. At the time of the incident, M.W. was approximately 6’1”—above the 99th percentile in height for girls her age.

22. M.W. and D.P. clearly did not match the description of the shoplifters that the Lululemon employee provided.

23. Around 4:03 PM, M.W. and D.P. stood on the Yellow Line platform awaiting the train traveling toward Greenbelt.

24. Both girls leaned against the low wall away from the track, and both occupied themselves with their cellphones while waiting for their train.

25. The Defendant Officers arrived on the train platform and walked toward M.W. and D.P., surprising them.

26. The Defendant Officers approached the girls, bypassing other travelers on the platform, including a pair of short girls, one of whom was wearing a pink jacket.

27. The Defendant Officers outnumbered the girls five-to-two, and the Defendant Officers were further flanked by Metro security.

28. At all times relevant to this Complaint, the Defendant Officers were in uniform.

29. When the Defendant Officers saw M.W. and D.P., M.W. possessed a small purse and D.P. possessed a plastic carryout bag containing a snack from the mall. Both were holding their cellphones.

30. The Defendant Officers accused M.W. and D.P. of shoplifting from Lululemon.

31. The Defendant Officers told M.W. and D.P. that they matched the description of shoplifting suspects from Lululemon.

32. Seeing that neither girl carried merchandise or a bag sufficiently large to contain merchandise, one Defendant Officer used a flashlight to peer behind the low wall the girls had been leaning against, to see if merchandise had been dumped there. None had.

33. It was not reasonable to suspect either girl had tossed stolen merchandise behind the wall because at the time the Defendant Officers confronted the girls, both were occupied with their cellphones and unaware the police were approaching.

34. The Defendant Officers informed M.W. and D.P. that they had to either go with the officers to Lululemon or leave in handcuffs.

35. M.W. told the officers that she and D.P. had not set foot in the Lululemon store and that they had not stolen anything.

36. Upon information and belief, the Defendant Officers should have been able to rule out M.W. and D.P. based on an inspection of the scene before them, including: (i) the inconsistency between the girls and the suspect description, (ii) the lack of stolen or out-of-place items on or around either girl, (iii) the lack of stashed items near the wall behind the girls, (iv) the fact that the girls only had with them a small purse and a plastic carryout bag, and (v) the girls' repeated insistence that they did not enter the Lululemon store.

37. D.P. told Defendant Officers that she and M.W. were minors and asked to contact their parents. One of the Defendant Officers asked D.P. her age, which she refused to provide, and again she stated her parents should be contacted. As a result, Officer John Doe 1 and Officer John Doe 2 handcuffed D.P.

38. While scared and handcuffed, D.P. accessed her cellphone from her back pocket and used her phone's Siri virtual assistant tool to call her father. When her father answered the phone, D.P. began to tell him what was happening to her and M.W.

39. When he heard D.P. talking to her father, a Defendant Officer snatched D.P.'s phone from her hand and terminated the call. D.P.'s father and D.P.'s mother attempted to call D.P. back several times with no response. D.P.'s father was left frantic with worry, understanding that his daughter was in distress, and not knowing what was happening.

40. M.W. used her phone to call her mother, but the Defendant Officers confiscated it before her mother could answer. A Defendant Officer pulled the phone from M.W.'s hand and shoved her back.

41. D.P. asked a bystander to call her father. D.P. provided the bystander her father's phone number. D.P. attempted to speak to her father via speakerphone, begging him to come and help her, but the Defendant Officers led her and M.W. away.

42. After approximately three minutes of unlawfully detaining both D.P. and M.W. on the platform, the Defendant Officers forced M.W. and D.P. off the platform, up the escalator, and outside of the faregates.

43. As the Defendant Officers brought D.P. and M.W. off the platform, two of the Defendant Officers grabbed D.P.'s arms on either side, and one of the Defendant Officers grabbed M.W.'s arm. They were followed by another two Defendant Officers and a Metro security officer.

44. The Defendant Officers pulled M.W. and D.P. through the faregates and into a corner of the Metro station where they were outside the full view of Metro station cameras.

45. The Defendant Officers held M.W. and D.P. at this location for approximately thirteen minutes. The Defendant Officers continued to ask the girls questions about their age, where they lived and what school they went to.

46. D.P. insisted that she had not stolen any clothes, and she implored the Defendant Officers to look at her and tell her *where* on her person she could be hiding clothes. She asked the Defendant Officers for a description of the shoplifting suspects, but they refused to answer. All the while, D.P.'s parents continued to call her phone and the police refused to answer.

47. Meanwhile, M.W. also asked for a description of the shoplifters and she begged the police to call her mother. M.W. told the police her mother's name and phone number, but they refused to call.

48. During this time, another officer approached the group with the Lululemon employee who had reported the shoplifting.

49. The employee immediately stated that M.W. and D.P. were not the shoplifters.

50. After the Lululemon employee confirmed what M.W. and D.P. had already told the officers—that they were not thieves—the Defendant Officers unhandcuffed D.P., letting the girls know they were now free to go. The police finally allowed the girls to contact their parents. Once the call connected, the Defendant Officers briefly spoke with M.W.'s mother and D.P.'s father.

51. Until the Defendant Officers released them, M.W. and D.P. were not free to leave the Defendant Officers' presence.

52. At no point did M.W. or D.P. consent to being stopped, seized, or questioned by any of the Defendant Officers.

53. The Defendant Officers should have immediately excluded M.W. and D.P. as suspects upon encountering them on the train platform holding no merchandise and no bag sufficiently large to contain merchandise and upon finding no discarded merchandise nearby.

54. The Defendant Officers should also have excluded M.W. and D.P. as suspects on the basis of height, as M.W. is very tall at 6'1". Upon information and belief, the Lululemon report indicated that the shoplifters were short females.

55. There was a second pair of females on the platform who matched the description, including a young lady wearing a pink jacket, whom Defendant Officers did not investigate.

56. The Defendant Officers insisted on unlawfully interfering with M.W. and D.P.'s right to be free from an unlawful stop and seizure.

57. Plaintiffs attempted to obtain further information about the purported Lululemon theft as well as the detention of M.W. and D.P. from APD. However, APD refused to provide any information. On April 2, 2025, M.W. and D.P., through counsel, submitted a FOIA request for police records about the shoplifting incident at Lululemon as well as records for the stop, seizure, and arrest of M.W. and D.P. APD declined to provide information, stating that it was withholding 13 records pursuant to Va. Code §§ 2.2-3706(B)(1), 2.2-3706(C).

58. After the unlawful detention, M.W. and D.P., through counsel, attempted to resolve the FOIA denial with the Arlington County Attorney's Office, but the Office refused to produce any documents.

59. On October 3, 2025, M.W. and D.P., through counsel, sent a "Demand to Produce and Preserve Records" to APD Chief of Police Andy Penn. The letter notified APD that based on the violation of M.W. and D.P.'s rights, they were considering their legal options. The letter included a request for "[a]ny and all records related to any shoplifting or theft" reported at Lululemon on February 17, 2025, as well as "any and all records related to [APD's] arrest of two minor individuals" in the Pentagon City Metro Station on February 17, 2025, around 4 PM. APD refused to produce any documents.

## CLAIMS FOR RELIEF

### Count I

### 42 U.S.C. § 1983 Unreasonable Seizure Claim
### Under the Fourth Amendment of the U.S. Constitution
### (Against Defendants Officers John Doe 1, John Doe 2, John Doe 3, John Doe 4, and John Doe 5 in their Individual and Official Capacities)

60. M.W. and D.P. incorporate by reference paragraphs 1–59 and further allege as follows:

61. At all times relevant hereto, M.W. and D.P. had a clearly established right under the Fourth Amendment to the U.S. Constitution, as incorporated against the states through the Fourteenth Amendment to the U.S. Constitution, to be free from unlawful and unreasonable stops and seizures.

62. Defendant Officers John Doe 1, John Doe 2, John Doe 3, John Doe 4, and John Doe 5 deprived M.W. and D.P. of their rights protected by the Fourth Amendment of the U.S. Constitution, guaranteeing citizens the right "to be secure in their persons . . . and effects, against unreasonable . . . seizures."

63. Defendant Officers John Doe 1, John Doe 2, John Doe 3, John Doe 4, and John Doe 5 unlawfully and unreasonably stopped and seized M.W. and D.P. with no reasonable suspicion or probable cause in violation of clearly established law.

64. M.W. and D.P. were not free to leave during this unlawful and unreasonable stop, nor did they believe they were free to leave.

65. Defendant Officers John Doe 1, John Doe 2, John Doe 3, John Doe 4, and John Doe 5 acted recklessly by stopping M.W. and D.P. with no reasonable suspicion and arresting them with no probable cause.

66. The unlawful stop and seizure by Defendant Officers John Doe 1, John Doe 2, John Doe 3, John Doe 4, and John Doe 5 was objectively unreasonable.

67. Officers John Doe 1, John Doe 2, John Doe 3, John Doe 4, and John Doe 5 are not entitled to a good-faith exception or qualified immunity.

68. As a direct and proximate result of Defendant Officers John Doe 1, John Doe 2, John Doe 3, John Doe 4, and John Doe 5's unlawful and unreasonable stop and seizure of M.W.

and D.P., both Plaintiffs have suffered and continue to suffer irreparable emotional and mental harm and are entitled to compensatory and punitive damages.

**Count II**

**D.P. and M.W.'s Virginia Common Law Claim for False Imprisonment (Against Defendants Officers John Doe 1, John Doe 2, John Doe 3, John Doe 4 and John Doe 5 in their Individual and Official Capacities)**

69. D.P. and M.W. incorporate by reference paragraphs 1–59 and further allege as follows:

70. At all times relevant hereto, D.P. and M.W. had a clearly established right under Virginia common law to be free from unlawful imprisonment.

71. Defendant Officers deprived D.P. and M.W. of their rights protected by Virginia common law, guaranteeing citizens the right to be free from "the direct restraint by one person of the physical liberty of another without adequate legal justification." *Schilling v. Washburne*, 592 F. Supp. 3d 492, 500 (W.D. Va. 2022).

72. Defendant Officers intentionally physically and verbally restrained D.P. and M.W., depriving them of liberty.

73. Defendant Officers' physical and verbal restraint of D.P. and M.W. made them fear disregarding the Defendant Officers' restraint of them.

74. Defendant Officers John Doe 1 and John Doe 2 further restrained D.P., by intentionally handcuffing her.

75. Defendant Officers had no legal justification to arrest, physically or verbally restrain, or otherwise deprive D.P. and M.W. of their physical liberty at any time relevant to this Complaint.

76. D.P. and M.W. never consented to Defendant Officers physically and verbally restraining them.

77. Defendant Officers acted recklessly by physically and verbally restraining D.P. and M.W. with no reasonable suspicion or probable cause.

78. The physical and verbal restraint of D.P. and M.W. by Defendant Officers was objectively unreasonable.

79. As a direct and proximate result of Defendant Officers' false imprisonment of D.P. and M.W., they suffered and continue to suffer tremendous and irreparable emotional and mental harm and are entitled to compensatory and punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, M.W. and D.P. pray for a trial by jury on all issues presently raised or that may be raised in any pleadings hereafter and further seek judgment against Defendants jointly and severally as follows:

a. An award of compensatory damages against Defendant Officers John Doe 1, John Doe 2, John Doe 3, John Doe 4, and John Doe 5 for their misconduct in Count I in the amount of $100,000;

b. An award of punitive damages against Defendant Officers John Doe 1, John Doe 2, John Doe 3, John Doe 4, and John Doe 5 for their misconduct in Count I in the amount of $100,000;

c. An award of compensatory damages against Defendant Officers John Doe 1, John Doe 2, John Doe 3, John Doe 4, and John Doe 5 for their misconduct in Count II in the amount of $100,000;

d. An award of punitive damages against Defendant Officers John Doe 1, John Doe 2, John Doe 3, John Doe 4, and John Doe 5 for their misconduct in Count II in the amount of $100,000;

e. An order granting appropriate attorneys' fees, costs, and expenses against all Defendant Officers pursuant to 42 U.S.C. § 1988 and all other applicable law; and

f. An order granting such other relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

M.W. and D.P. request trial by jury as to all issues in this case.

Respectfully submitted:

Dated: November 13, 2026

*/s/ Tara Reinhart*
Tara L. Reinhart (Retired Partner) (V.A. Bar No. 37795)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202)-439-3545
tara.reinhart@skadden.com

*Attorney for Plaintiffs, M.W. and D.P.*